**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**DANIEL BRADY,**
10240 Hatherleigh Drive
Bethesda, MD 20814

   **Plaintiff,**

v.

**LIQUIDITY SERVICES, INC.**
6931 Arlington Road, Suite 200
Bethesda, MD 20814

   **Defendant**.

Case No. _____

**JURY TRIAL DEMANDED**

**CIVIL COMPLAINT FOR EQUITABLE AND
MONETARY RELIEF AND DEMAND FOR JURY TRIAL**

  Plaintiff Daniel Brady sues Defendant Liquidity Services, Inc. (LSI) for violations of the

anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h) (FCA) and the D.C. Wage

Payment & Collection Law, D.C. Code § 32-1301 *et seq.*

**INTRODUCTION**

  1.  Daniel Brady began his employment with LSI in January 2013 as Vice President

of Finance.

  2.  LSI maintains multiple contracts with the Defense Logistics Agency; and one

contract specifically sets forth a revenue sharing agreement between the Agency and LSI.

  3.  In July 2015, LSI hired a new Chief Financial Officer, Jorge Celaya.

  4.  Soon after LSI hired Celaya, Brady began experiencing problems with Celaya,

many of which were related to Celaya's attempts to avoid accountability.

  5.  In September 2016, Brady and Celaya had a conversation about LSI's accounting

with respect to LSI's profit sharing contract with the Defense Logistics Agency.

6.     Celaya questioned Brady about the accounting methods being used, and Brady informed Celaya that doing it any other way would be illegal.

7.     Brady immediately reported this conversation and his concerns about Celaya's possible actions to LSI's Chief Accounting Officer.

8.     Within days of Brady engaging in protected activity by reporting his concerns, Celaya informed Brady that LSI was terminating Brady.

## JURISDICTION AND VENUE

9.     This Court has personal jurisdiction over LSI because it maintained its principal place of business in this district for the duration of Brady's employment, and LSI continues to regularly conduct business in this district.

10.     This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of the United States, specifically the FCA.

11.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because it is the judicial district where many of the unlawful employment practices are alleged to have been committed, and because LSI maintained its principal place of business in this district for the duration of Brady's employment.  LSI continues to regularly conduct business in this district.

## PARTIES

12.     Plaintiff Brady is a resident of Maryland and a citizen of the United States.  Brady was an employee of LSI.

13.     Defendant LSI is a Delaware corporation with its principal place of business in Bethesda, MD.  On October 1, 2017, LSI moved its headquarters from 1920 L St., NW,

Washington, DC to its current location at 6931 Arlington Road, Suite 200, Bethesda, MD.

## FACTUAL ALLEGATIONS

**Brady began his employment with LSI after a successful career and received good performance evaluations.**

14.    Brady earned his CPA license in 1987 after graduating with a business degree, specializing in accounting.

15.    He experienced a successful career in accounting until he transitioned to LSI.

16.    Brady began his career at LSI on January 14, 2013 as the Vice President of Finance for the Capital Assets Group.

17.    LSI does significant business with the federal government through two main contracts.

18.    The first contract with the Defense Logistics Agency requires LSI to sell excess equipment from military bases.

19.    This contract accounted for approximately thirty percent of LSI's consolidated revenues for quarters ending December 31, 2015 and December 31, 2016.

20.    LSI's second contract with the Defense Logistics Agency requires LSI to sell excess scrap metal from military bases and accounted for approximately ten percent of LSI's consolidated revenues for the quarters ending December 31, 2015 and December 31, 2016.

21.    This second contract was structured as a profit sharing agreement with the government.

22.    At Brady's hire, he reported to the Chief Financial Officer, Jim Rallo.

23.    Rallo consistently issued Brady good performance evaluations.

**In June 2014, LSI reassigned Rallo; and it hired Jorge Celaya as the replacement CFO in July 2015.**

24.     In or about June 2014, LSI appointed Rallo to the company's Retail Supply Chain Group.

25.     Rallo served in this role and in his capacity as CFO for approximately one year.

26.     LSI began searching for a new CFO and experienced trouble finding a qualified candidate.

27.     In or about July 2015, LSI hired Jorge Celaya as the new CFO, replacing Rallo.

28.     Celaya lacked knowledge or experience in some areas and has never been a certified public accountant.

29.     An LSI board member knew Celaya through another professional connection and recommended Celaya for the position.

30.     LSI publicly announced Celaya's role as CFO in August 2015.

31.     Brady reported directly to Celaya in Celaya's capacity as the new CFO.

32.     Celaya's direct reports included Brady, the corporate controller, and the Vice President of Finance.

33.     In September 2015, Celaya asked Rallo to complete Brady's annual performance review, even though Brady was reporting to Celaya.

34.     Rallo again gave Brady a good performance rating.

35.     In or about December 2015, Celaya provided Brady with his 2016 fiscal year performance goals while Brady was traveling in Asia on business.

36.     Celaya said that he and Brady would discuss the goals in early 2016, but did not follow up.

37.     Celaya did not get along with the public accounting firms retained by LSI to perform the financial statements audit, SOX support services, and ERP project leadership and

management, and claimed these public accounting firms were responsible for any issues that arose.

38.     After LSI terminated Brady, Brady met with an executive from one of the public accounting firms.

39.     This executive informed Brady that Celaya previously received a reprimand from the Securities and Exchange Commission.

40.     The executive said, "I'm surprised you didn't know this.  Celaya had some sort of letter of reprimand from the SEC from a previous employer."

41.     In or about late 2015, the working relationship between Brady and Celaya began experiencing troubles due to Celaya's attempts to avoid accountability for the responsibilities of his position.

42.     Celaya attempted to avoid accountability; he routinely required subordinates to draft memos for him but refused to have his name on the correspondence.

43.     In or about September 2015, Celaya prepared a presentation to LSI's Board of Directors.

44.     Upon Celaya's request, Brady reviewed the Celaya-drafted presentation and provided feedback.

45.     Brady's feedback to Celaya during their face-to-face meeting was significant because Celaya's presentation deck was poorly crafted, redundant, and too long.

46.     Celaya dismissed Brady's advice.

47.     After the presentation, a board member told Celaya to never do that again, referring to his presentation as a "dump of numbers."

48.     In or about October 2015, Brady approached Celaya about two memos on

discretionary bidding.

49.     Under the Uniform Commercial Code, LSI is required to follow proper auction law, and in holding an online auction, bids must work a certain way.

50.     If the auction takes place differently, the company could be liable for UCC or state law violations.

51.     Celaya approached LSI's internal auditor, Alex Orlov (whose day-to-day priorities were set by Celaya, even though Celaya mandated that Orlov report directly to Brady), and asked Orlov to perform an internal audit review of the discretionary bidding process at LSI.

52.     Once the internal audit review was complete, Celaya visited Arizona and discussed the internal audit review during a face-to-face meeting with Orlov.

53.     Celaya contemporaneously asked LSI's legal department and Jill Williamson, LSI's Chief Compliance Officer at the time, to provide an assessment of the discretionary bidding situation.

54.     Brady told Celaya that the discretionary bidding process is a "big deal" and "LSI could have crossed the line or broken auction law" and "ignorance is not a defense if you break auction law under the commercial code."

55.     Brady volunteered to take the assessments of Orlov and the Chief Compliance Officer and prepare a memo on behalf of Celaya that would ultimately be presented to LSI's CEO, its Board of Directors, and its external auditors.

56.     At Celaya's request, Brady submitted a draft of the summary memo he had prepared on behalf of Celaya to Celaya, the CEO, LSI's General Counsel, and Williamson (the Chief Compliance Officer) for feedback.

57.     None of these parties made or suggested any changes to the memo.

58.     After reviewing the memo, Celaya informed Brady the memo was good and an accurate portrayal of Orlov's internal audit review and the Chief Compliance Officer's assessment, but requested that Brady remove his (Celaya's) name from it.

59.     After receiving the CEO's approval, Brady did not feel comfortable removing Celaya's name from the memo he had prepared on Celaya's behalf, and submitted the memo to the CEO and external auditors with Celaya's name on the memo as well as his own.

60.     In addition, because the memo opined on an issue of financial statement materiality and Celaya, with direct knowledge of discretionary bidding situations and other potential financial statement impacts, was the only person who could opine on this issue, Brady believed it to be unethical to submit the memo without Celaya's name.

61.     In or about late 2015, Brady spoke with the Vice President of Human Resources, Mike Lutz, and disclosed the challenges he experienced working with Celaya.

62.     Lutz told Brady he was aware of the problems Brady faced.

63.     In or about April 2016, LSI raised Brady's base salary from $205,000 to $220,000 and also issued a larger than normal equity award to him.

64.     In or about August 2016, Celaya assigned Brady to work with Anna Bakalova, a newly-hired Financial Planning & Analysis manager.  Bakalova worked for Celaya on a daily basis, but reported to Sweeney.

65.     Celaya tasked Bakalova and Brady to develop an activity-based and/or resourced-based approach to allocate IT expenses to each business unit for the FY17 Budget.

66.     After completing this assignment in early September 2016, Brady noted that the approach resulted in significantly less IT costs for the profit-sharing Scrap business for both FY16 and FY17.

67.     Brady discussed the significance of the improved allocation approach with Bakalova, who said she would discuss with Celaya.

68.     Brady next discussed the IT allocation analysis with Sweeney who said that Bakalova was working directly with Celaya.

69.     Finally, Brady discussed this IT allocation analysis and the significance of the over-allocation of IT costs in FY16 to the profit-sharing Scrap contract with Celaya.  Celaya said he would take it under consideration and discuss with the CEO if Celaya felt the need.

70.     Brady explained in each conversation with Bakalova, Sweeney, and Celaya that it was unacceptable to over-allocate IT and any corporate costs to the profit-sharing Scrap business.

**In September 2016, Brady disclosed potential accounting fraud, and LSI only days later terminated Brady.**

71.     In or about early September 2016, Celaya telephoned Brady to discuss LSI's scrap metal contract with the Defense Logistics Agency.

72.     Celaya asked Brady if LSI had favorability for IT costs and allocated that favorability to all business units, part of which went to DoD's scrap profit sharing business.

73.     Celaya asked, "Would we have to share that with the government?"

74.     Brady said, "Yes."

75.     Brady further explained that if LSI had less IT costs, driving favorability to the bottom line, LSI would need to share with the government.

76.     Celaya replied, "Why would [LSI] ever want to do that?"

77.     Brady said that it was a matter of proper accounting and federal mandate.

78.     Celaya replied, "I'm not sure if I see it that way" and ended the conversation.

79.     Brady then went to the Chief Accounting Officer and expressed his concerns

about the measures Celaya would use, saying that it was "a very big deal," and that proper accounting must be followed.

80.     The Chief Accounting Officer told Brady not to worry about the topic.

81.     On September 16, 2016, Celaya called Brady into his office and said, "Sorry things didn't work out."

82.     He asked Brady to hand in his computer, building access ID, and told him it was his last day.

83.     Celaya terminated Brady without ever providing feedback or giving Brady a performance review (which was due in September).

84.     Because Brady had accrued unused Paid Time Off (PTO), LSI allowed Brady to stay home, as an employee, until November 1, 2016.

85.     LSI fully terminated Brady's employment as of November 1, 2016.

86.     Brady's offer letter states LSI will pay Brady a forty percent target bonus annually.

87.     The offer letter does not state when the bonus payment will be made or that Brady must be employed on a certain date to receive the bonus.

88.     This bonus payment generally occurs within 60 days after the fiscal year, which concludes on September 30.

89.     Per Brady's offer letter, LSI owed Brady a bonus of approximately $62,000 for 2016 based on qualitative and quantitative measures established by LSI as part of the Capital Assets Group, but did not pay him the bonus.

**COUNT I**
**FCA Retaliation**
**31 U.S.C. § 3730(h)**

90.     Plaintiff Brady re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs.

91.     The False Claims Act, 31 U.S.C. § 3730(h), prohibits an employer from retaliating against employees who engage in protected conduct by taking lawful actions in furtherance of an FCA claim or by making efforts to stop one or more violations of the FCA.

92.     An employee need not actually file a *qui tam* suit or even know about the protections of Section 3730(h) to qualify for protection under the retaliation provisions of the FCA.

93.     An employee who characterizes the employer's conduct as illegal or fraudulent or who tries to stop a false claim from being made engages in protected conduct.

94.     Brady engaged in protected activity when he informed Celaya about the proper accounting protocols that must be followed on LSI's scrap metal contract with the Defense Logistics Agency and that any other approach would be illegal.

95.     Brady again engaged in protected activity when he reported concerns about an impending violation to the Chief Accounting Officer.

96.     Brady suffered a materially adverse action when LSI terminated his employment on September 16, 2016, only days after he engaged in protected activity, and his termination took effect on November 1, 2016.

97.     LSI retaliated against Brady because he engaged in protected activity under the FCA.

98.     Celaya and the Chief Accounting Officer knew of Brady's protected activity.

99.     There is sufficient temporal proximity to infer a causal connection between Brady's protected activity and his termination.

100.    LSI had no legitimate business reasons for firing Brady, and its stated reasons for its adverse action against Brady are pretext for a retaliatory motive.

101.    Brady suffered substantial monetary and non-monetary damages as a direct and proximate result of LSI's retaliation.

102.    Brady is entitled to such legal or equitable relief as will effectuate the purposes of the anti-retaliation provision of the FCA.

**COUNT II**
**D.C. Payment and Collection of Wages Act**
**D.C. Code § 32-1303, et seq.**

103.    Plaintiff Brady re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs.

104.    Brady was an "employee" and LSI was an "employer" as those terms are defined in D.C. Code § 32-1301.

105.    To date, LSI has not paid Brady his earned 2016 bonus.

106.    At the time of his discharge, LSI owed Brady $62,000 in wages earned in the form of this bonus.

107.    A violation of D.C. Code Ann. § 32-1303 entails liability for the wages due as well as liquidated damages in the amount of "10 per centum of the unpaid wages for each working day during which such failure shall continue after the day upon which payment is hereunder required, or an amount equal to treble the unpaid wages, whichever is smaller."

108.    D.C. Code § 32-1308 provides that a court shall allow costs of the action, including costs or fees of any nature, and reasonable attorney's fees, to be paid by the defendant for a violation of D.C. Code Ann. § 32-1303.

109.    Brady has suffered damages for this violation, including back wages unlawfully withheld and reasonable attorneys' fees and costs.

110.    Brady has also suffered such that equitable relief is required.

## PRAYER FOR RELIEF

Plaintiff Daniel Brady prays this Honorable Court for judgment against Defendant and respectfully demands reinstatement or front pay, two times the amount of back pay, interest on the back pay, unpaid wages, compensation for special damages sustained, reasonable attorney's fees, pre-judgment interest, court costs, and any other relief that this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff Daniel Brady demands a trial by jury for any and all issues proper to so be tried.

Respectfully submitted,


___/S/ John T. Harrington_____
John T. Harrington (D.C. Bar No. 987659)
R. Scott Oswald (D.C. Bar No. 458859)
The Employment Law Group, P.C.
888 17th Street, NW, 9th floor
Washington, D.C. 20006
(202) 261-2830
(202) 261-2835 (facsimile)
tharrington@employmentlawgroup.com
soswald@employmentlawgroup.com
*Counsel for Plaintiff Daniel Brady*